UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROSEMARY VEGA and JESUS RAMOS, ) ) Plaintiffs, ) ) vs. ) ) THE CHICAGO BOARD OF EDUCATION, JADINE ) CHOU, DAVID VITALE, MAHALIA HINES, ) ANDREA ZOPP, CARLOS AZCOITIA, JESSE ) RUIZ, HENRY BIENEN, REGINALD WILLIAM, ) WILLIE SIMS, MARK SCOTT, JOSHUA ) McCALLISTER, ELLIS INGRAM, VARRICK ) DOUGLAS, and KENDALL DONALDSON, ) ) Defendants. ) | 15 C 3221 Judge Gary Feinerman |

## MEMORANDUM OPINION AND ORDER

Rosemary Vega and Jesus Ramos brought this suit under 42 U.S.C. § 1983 and Illinois law against the Chicago Board of Education, the Board's members, and certain Board security personnel. The operative complaint alleges that Defendants violated Vega's First Amendment rights by removing her from a July 2014 public Board meeting and restricting her ability to attend subsequent meetings, and that they violated Vega's and Ramos's rights under Illinois law in the course of removing them from the July 2014 meeting. Doc. 46. The parties have cross-moved for summary judgment. Docs. 173, 177, 182. Plaintiffs' motion is denied, Defendants' motions are granted as to the federal claims, and the court exercises its discretion under 28 U.S.C. § 1367(c)(3) to relinquish jurisdiction over the state law claims.

## Background

Defendants urge the court to disregard the assertions in Plaintiffs' Local Rule 56.1(a)(3) and 56.1(b)(3)(C) statements that rely on improper evidence. Defendants are correct as to

Plaintiffs' Exhibits A, O, T, U, V, W, and Y. Exhibit A, Plaintiffs' unverified complaint, Doc. 180-1, is not evidence. *See Reed v. Allied Waste Transp., Inc.*, 621 F. App'x 345, 347 (7th Cir. 2015) (holding that "unsworn allegations are not evidence"); *Cartwright v. Cooney*, 2013 WL 842655, at *1 (N.D. Ill. Mar. 6, 2013) (declining to consider an unverified complaint as evidence on summary judgment); *cf. Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996) (holding that a verified complaint is evidence on summary judgment). Exhibits O and Y, Docs. 180-12, 180-15, are "inadmissible hearsay" because they are newspaper articles offered for the truth of their content. *Chi. Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 761 (7th Cir. 2013) (holding that a newspaper article was inadmissible hearsay). Exhibits T, U, V, and W are video clips that may not be utilized on summary judgment because Plaintiffs did not produce them to Defendants during discovery. *See* Fed. R. Civ. P. 37(c)(1); *Shott v. Rush Univ. Med. Ctr.*, 2014 WL 7665075, at *3 (N.D. Ill. Nov. 6, 2014). Accordingly, the court will disregard any of Plaintiffs' Local Rule 56.1 assertions, or portions thereof, that rely exclusively on those exhibits.

Because summary judgment will be granted to Defendants, the court sets forth the facts as favorably to Plaintiffs as permitted by the record and Local Rule 56.1. *See Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 879 (7th Cir. 2017) ("Summary judgment is appropriate when, after construing the record in the light most favorable to the nonmoving party, we conclude that no reasonable jury could rule in favor of the nonmoving party."). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

The Board, which oversees and operates Chicago's public schools, holds monthly meetings that are open to the public. Doc. 197 at ¶¶ 3, 8. Up to sixty members of the public can

register to speak at any given meeting, with registration conducted on a first-come, first-served basis. *Id*. at ¶ 8. Each speaker has two minutes to address the Board. *Ibid*. The "vast majority" of speakers express disapproval of the Board and its decisions. *Id*. at ¶ 9.

The Board's Public Participation Guidelines govern the conduct of those who attend Board meetings. *Id*. at ¶ 11. At all relevant times, the Guidelines provided:

> Courteous, respectful and civil behavior is expected from all speakers and all persons attending a Board meeting. Unsolicited comments and disruptive behavior are prohibited. Individuals who are disruptive may be given a warning and also, may, if necessary be removed from the meeting. If any individual is removed from a meeting as a result of disruptive behavior, then the individual may forfeit their right of reentry to future Chicago Board of Education meetings.

*Ibid*. "Disruptive behavior" includes an attendee's walking up to, shaking a fist at, or yelling at Board members; it also includes a speaker's refusal to stop speaking after her allotted two minutes have elapsed. *Id*. at ¶ 13.

The Board does not always bar individuals who engage in disruptive behavior from attending future meetings. For example, a woman named Queen Sister spoke for more than two minutes at a Board meeting and continued shouting her opinions after she left the podium, but was not removed or banned from attending future meetings. Doc. 196 at ¶¶ 50-51. Still, the Board has barred at least three individuals (other than Vega) from attending meetings due to their disruptive behavior: (1) Ramos, Vega's co-plaintiff, who was banned "until future notice" after the July 2014 meeting; (2) Ronald Jackson, who was banned for nine meetings following a verbal and physical altercation at the November 2013 meeting; and (3) Ellyson Carter, who was banned for fourteen meetings after verbally threatening a Board employee. *Id*. at ¶¶ 46, 47, 49.

Vega has attended twelve to fifteen Board meetings. Doc. 197 at ¶ 9. The Board was aware of this fact, and Board employees sent emails or texts noting her presence during

3

meetings. Doc. 196 at ¶ 53. Vega violated the Guidelines at several meetings. At the March 2014 meeting, she continued to speak after her allotted time had expired and was ushered away from the podium. *Id*. at ¶ 23; Doc. 197 at ¶ 22. Two months later, at the May 2014 meeting, Vega told the Board while at the podium that she would "get kicked out of the Board meeting every month for two minutes for the next how many years you got of life." Doc. 197 at ¶ 23. She then exceeded her speaking time, continued to speak after being asked to stop, and was escorted out of the meeting. *Ibid*.

During the July 2014 meeting, while Vega was waiting to speak, one speaker likened the Board to a plantation master, and Queen Sister then referred to the Board as "deceivers," "great pretenders," "the devil incarnate," "Mr. Moneybags," "snakes," "liars," "thieves," and "blood thirsty." *Id*. at ¶ 15. While Queen Sister was speaking, one Board member, Jesse Ruiz, stood and began to exit because he needed to use the restroom. *Id*. at ¶ 17. Vega rose from her chair, rushed toward the dais where the Board members were sitting, shook her fist, and yelled "BOOOOO! COWARD! COWARD!," interrupting Queen Sister. *Id*. at ¶ 18; Doc. 196 at ¶ 27. (Plaintiffs assert in their Local Rule 56.1(a)(3) statement that Vega "walked toward the front of the room," Doc. 196 at ¶ 27, but they admit Defendants' assertion that she "rushed toward the dais," Doc. 197 at ¶ 18, and they will be held to that admission. Plaintiffs also assert that Vega "shook her fist," Doc. 196 at ¶ 27, and they will be held to that assertion as well.) Reggie Williams, the Board's Deputy Director of Safety and Security, believed that Vega posed an immediate threat to Queen Sister and the Board, Doc. 197 at ¶ 19, and several security officers moved towards her immediately after she began approaching the dais, Doc. 198 at ¶ 16.

When Vega returned to her seat, Williams and other security officers asked her to leave. Doc. 197 at ¶ 20. Vega responded, "no, I have a right to speak," and repeatedly refused to leave.

4

*Ibid*. Vega was informed that she would be escorted out if she did not leave voluntarily. Doc. 198 at ¶ 32. Ramos, who was seated nearby, stated that the pair would not leave. Doc. 197 at ¶ 20; Doc. 198 at ¶¶ 35-36. Everyone began "shouting and talking," and Ramos engaged in a physical struggle with security officers, after which he and Vega were physically removed by several officers. Doc. 197 at ¶ 20; Doc. 198 at ¶ 45.

On August 1, 2014, the Board sent Vega a letter stating that she had forfeited her right to attend future Board meetings until further notice. Doc. 196 at ¶ 33; Doc. 197 at ¶ 26. Although barred from attending Board meetings, Vega still could submit written testimony to the Board and make appointments to meet with Board members during their office hours. Doc. 197 at ¶¶ 26-27. (Vega asserts that she intended to direct her speech "to the wider audience of the public and residents of Chicago who either attended the board meetings or viewed the Board Meetings online," and that the ban on her attending meetings impacted her ability to do so. Doc. 207 at ¶ 60. That assertion is disregarded. The sole evidence Plaintiffs cite is a letter from another individual expressing her appreciation for Vega's comments during Board meetings, Doc. 197-7, which does not bear on the question whether *Vega* intended to direct her speech to other attendees at, or online viewers of, Board meetings.)

On March 7, 2017—more than 2½ years after the Board barred her from attending Board meetings—the Board lifted the ban. Doc. 196 at ¶ 36; Doc. 197 at ¶ 28. Under the measures imposed at that time, which remain in effect, Vega may register to speak at Board meetings just like anybody else, but a security officer will meet her when she signs in and escort her to an overflow room until her speaking time, at which point she will be escorted to the podium in the meeting room and escorted out when finished speaking. Doc. 197 at ¶ 28.

**Discussion**

Plaintiffs allege that Defendants violated Vega's rights under the First Amendment and Vega's and Ramos's rights under Illinois law.

**I.       Vega's First Amendment Claim**

Plaintiffs claim that Defendants violated Vega's First Amendment rights by: (1) removing her from the July 2014 Board meeting before her speaking time; (2) banning her from attending Board meetings from August 2014 through March 2017; and (3) imposing the rules governing her attendance at Board meetings from March 2017 to the present.  Plaintiffs' summary judgment motion gestures to a possible facial challenge to the Guidelines, Doc. 176 at 5-8, but their Local Rule 56.1(b)(3)(B) response admits that their "First Amendment claim is limited to what occurred on July 23, 2014 and the restrictions that followed," Doc. 197 at ¶ 37, and the operative complaint does not mention any facial challenge, Doc. 46.  Any facial challenge would have failed on the merits in any event.  *See Milestone v. City of Monroe*, 665 F.3d 774, 783-84 (7th Cir. 2011) (holding that a senior center's code of conduct, which required patrons to treat everyone with respect and barred abusive language, "passe[d] constitutional muster as a content-neutral and reasonable time, place, or manner regulation").

"The First Amendment permits [the] government to regulate [the] use of its property in certain instances depending on the nature of that property."  *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011).  The parties agree that public Board meetings take place in a "designated public forum," Doc. 176 at 4-5; Doc. 182 at 8, and that the Board accordingly may "enforce reasonable time, place, and manner restrictions" that are content neutral and narrowly tailored to serve a significant government interest, and that provide ample alternative channels of communication.  *Surita*, 665 F.3d at 870.

### A. Removing Vega from the July 2014 Meeting and the Subsequent Restrictions on Her Attendance Were and Remain Content-Neutral.

"The first determination of the time, place, and manner analysis is whether the [restriction] in question is content-neutral." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1037 (7th Cir. 2002). "Government regulation of expressive activity is content neutral so long as it is justified without reference [to] the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis and internal quotation marks omitted). Thus, when a restriction, "[r]ather than focusing on *what* [an individual] say[s,] … focuses on *the manner* in which [she] say[s] it," it is content-neutral. *Milestone*, 665 F.3d at 783. By contrast, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). "Restrictions that favor or disfavor the content of certain speech based on the speaker rather than the content of the message are … content based." *Surita*, 665 F.3d at 870.

The summary judgment record would not permit a reasonable juror to find that Vega's removal from the July 2014 meeting or subsequent restrictions on her attendance were motivated by the content of her speech or her desire to criticize the Board. Rather, those measures indisputably were motivated by how Vega chose to express her views. Vega was ejected from the July 2014 meeting after she rushed to the dais to shake her fist and yell "COWARD! COWARD!" at a Board member. Rushing up to the dais, yelling at a Board member, shaking her fist, and interrupting another speaker violated the Guidelines and were perceived by security officers as threatening. Making matters worse, Vega had recently violated the Guidelines at the March 2014 and May 2014 meetings—and making matters even worse, she warned at the May 2014 meeting that she was willing to be "kicked out of the Board meeting every month for two minutes for the next how many years you got of life."

Given this, the Board's enforcement of the Guidelines and imposition of restrictions on Vega's attendance at Board meetings were content-neutral, not speaker- or content-based. True enough, no other individual has been subject to more stringent restrictions. But Plaintiffs adduce no evidence that anybody other than Vega repeatedly flouted the Guidelines and promised to do so at every future Board meeting. Nor do Plaintiffs suggest that any other speaker was permitted to remain in a Board meeting after engaging in conduct as severely disruptive as Vega's. Likewise, while Defendants were alert to Vega's presence at Board meetings, nothing in the record indicates that the monitoring arose from the content of Vega's speech or any desire to stifle her criticism of the Board. Finally, the fact that no attendance restrictions were placed on Queen Sister, whose criticisms of the Board (calling its members "snakes" and "the devil incarnate") could not have been more pungent, confirms that Defendants did not act towards Vega in a content-based manner.

Thus, because the record indisputably shows that that Defendants' actions were motivated not by the content of Vega's speech, but by her persistently disruptive conduct and threat to continue such conduct, her removal from the July 2014 meeting and subsequent restrictions placed on her attendance were content-neutral. *See Surita*, 665 F.3d at 871 (noting that, although banning the plaintiff from speaking during the city council's "audience time" unless he apologized to a government official he had criticized at a rally two days earlier was content-based, if his "manner [had been] disruptive, [the defendant] could have barred his speech completely"); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004) (holding that "the overwhelming, and wholly sufficient, motive to eject David Eichenlaub from [a township board of supervisors] meeting was the perfectly sustainable and content-neutral desire to prevent his badgering, constant interruptions, and disregard for the rules of decorum").

### B. Removing Vega from the July 2014 Meeting and the Subsequent Restrictions on Her Attendance Were and Remain Narrowly Tailored to Serve a Significant Government Interest.

To pass First Amendment muster, the measures taken against Vega must be "narrowly tailored to serve a significant government interest." *Weinberg*, 310 F.3d at 1037. "'[N]arrow tailoring' does not mean that the government must use 'the least restrictive or least intrusive means' to achieve its end; rather … 'the requirement of narrow tailoring is satisfied so long as [a] … regulation[] [or action] promotes a substantial government interest that would be achieved less effectively absent regulation [or action].'" *Milestone*, 665 F.3d at 784 (quoting *Ward*, 491 U.S. at 798-99) (internal quotation marks omitted). To satisfy this test, a restriction need "not be the least restrictive method for achieving the government's goal," but it "cannot substantially burden more speech than necessary." *Weinberg*, 310 F.3d at 1040.

Plaintiffs do not suggest that the Board's desire to maintain order at meetings is not a "significant government interest"; nor do they suggest that Vega's removal from the July 2014 meeting was not narrowly tailored to serve that interest. Doc. 176 at 10-12 (arguing that Vega's removal violated the First Amendment only "[b]ecause the restriction … was not content neutral"); Doc. 194 at 3-4 (same); *see Sandefur v. Vill. of Hanover Park*, 862 F. Supp. 2d 840, 847 (N.D. Ill. 2012) ("It is well-settled that a local government has a significant interest in maintaining order at its meetings.") (collecting cases). Rather, Plaintiffs argue that the 2½-year ban on Vega attending Board meetings, and the restrictions imposed on her attendance when the ban was lifted in March 2017, were and are not narrowly tailored to accomplish the Board's legitimate goals. Plaintiffs are incorrect.

The Board's August 2014 letter informed Vega that she would be banned from attending meetings until further notice. As Plaintiffs recognize, the pertinent time frame for determining whether the ban was narrowly tailored is 2½ years. Doc. 176 at 9; Doc. 194 at 4. That ban did

9

not burden more of Vega's speech than necessary to maintain order during Board meetings or to ensure that members of the public who wished to address the Board in accordance with the Guidelines had that opportunity. Over a four-month span in 2014, Vega demonstrated a persistent and escalating willingness to cause disturbances during Board meetings. In March 2014, she exceeded her allotted two minutes and had to be ushered from the podium. In May 2014, she told the Board that she would "get kicked out of the Board meeting every month for two minutes for the next how many years you got of life," and then was removed when she refused to stop talking after exceeding her allotted speaking time. Finally, in July 2014, she rushed the dais while yelling at Board member and shaking her fist, prompting the concern of security personnel, and then refused to leave when security personnel asked her to do so. Vega's repeated violation of the Guidelines, along with her promise of continued noncompliance, provided ample justification for the Board to take her at her word and ban her from attending meetings for 2½ years.

Accordingly, the ban was sufficiently tailored to advance the Board's interest in conducting its meetings in a safe and orderly fashion. *See Ward*, 491 U.S. 781 (holding that "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest," a regulation will not fail narrow tailoring "simply because a court concludes that the government's interest could be adequately served by a less-speech-restrictive alternative"); *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 559 (7th Cir. 2009) ("'Narrow tailoring' does not mean that the ordinance must be the least restrictive possible regulation"). The fact that Jackson and Carter, who also engaged in disruptive behavior, were subjected to shorter bans does not win the day for Vega, as the record does not indicate that either individual repeatedly violated and threatened to continue violating the Guidelines.

The post-March 2017 restrictions, which permit Vega to speak at Board meetings but require that she wait in an overflow room until her time at the podium, likewise are narrowly tailored. Given Vega's disruptive conduct and promise to continue violating the Guidelines, when the Board lifted the ban on her attendance at Board meetings, it was justified in imposing limited restrictions on her access to the meeting room. This is not to say that those restrictions might at some point cease to be narrowly tailored, but the Board cannot be faulted for giving Vega a somewhat extended test-run, and seeing whether she can conduct herself appropriately, before lifting those restrictions entirely.

> **C. Removing Vega from the July 2014 Meeting and the Subsequent Restrictions on Her Attendance Left and Leave Her with Ample Alternate Channels of Communication.**

The "last inquiry" in the First Amendment analysis is whether the restrictions provided Vega with "ample alternate channels" of communication. *Weinberg*, 310 F.3d at 1040-41. "An adequate alternative does not have to be the speaker's first or best choice or one that provides the same audience or impact for the speech. But the alternative must be more than merely theoretically available—it must be realistic as well." *Horina v. City of Granite City*, 538 F.3d 624, 635 (7th Cir. 2008) (internal citations and quotation marks omitted).

During the 2½-year ban on her attending Board meetings, Defendants provided Vega with two alternate channels of communication: (1) the opportunity to meet with individual Board members during their office hours; and (2) the ability to submit written testimony to the Board. Those channels, when considered together, provided Vega with adequate alternatives to communicate her message to the Board. *See Sandefur*, 862 F. Supp. 2d at 849 (holding that where the plaintiff was barred from attending a village board meeting, his ability to write "Board members a letter or e-mail" was an adequate alternative channel); *I.A. Rana Enters., Inc. v. City*

11

*of Aurora*, 630 F. Supp. 2d 912, 923-24 (N.D. Ill. 2009) (holding that the plaintiff's ability to communicate his "concerns to council members in writing" was an adequate alternate channel).

In fact, Plaintiffs do not suggest that Vega's ability to submit written testimony impaired her ability to communicate with the *Board*. Instead, Plaintiffs argue that the ban limited Vega's ability to "reach [an] … audience beyond the Defendant Board and Board Members." Doc. 194 a 5. This argument fails, not only because an alternate channel need not "provide[] the same audience or impact for the [speaker's] speech," *Horina*, 538 F.3d at 635, but also because the record does not suggest in the least that Vega was hindered in expressing her views to interested members of the public in venues other than the monthly Board meetings. *Weinberg*, 310 F.3d at 1042 (quoting *Gresham*, 225 F.3d at 906).

Plaintiffs also argue that the alternative channels made available to her did not allow her to communicate with individuals who attended Board meetings. *See Milestone*, 665 F.3d at 784 (noting that alternative channels are inadequate if the restrictions "prevent speakers from reaching their target audiences"). That argument fails as well because Plaintiffs adduce no evidence suggesting either that Vega's intended audience included other individuals at Board meetings or that communicating with such individuals specifically, rather than members of the public in general, was essential to her effectively conveying her message.

Thus, because Vega during the 2½-year ban could communicate her concerns directly to Board members in writing and in person, and to continue to express her views regarding the Board at any time and in any place except for the Board's meeting room, she was provided with adequate alternative channels of communication. It follows *a fortiori* that the less restrictive March 2017 restrictions, which allow Vega to speak at Board meetings, leave her with ample channels as well.

For these reasons, Defendants are entitled to summary judgment on Vega's First Amendment claim. It follows that Vega is not entitled to summary judgment on that claim.

## II. *Monell* Claim Against the Board

Absent an underlying First Amendment violation, Plaintiffs cannot maintain a *Monell* claim against the Board, so summary judgment is warranted on the *Monell* claim. *See Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) ("[I]f no constitutional violation occurred in the first place, a *Monell* claim cannot be supported.") (citation omitted); *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) ("It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights.").

## III. State Law Claims

The operative complaint premises jurisdiction over Plaintiffs' state law claims on 28 U.S.C. § 1367(a). Doc. 46 at ¶ 4. Section 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (same). That general rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Williams*, 509 F.3d at 404; *see also RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012).

None of the exceptions apply here. First, if this court relinquishes supplemental jurisdiction over the state law claims, Illinois law would give Plaintiffs one year to refile those claims in state court if their limitations period(s) expired while the case was pending here. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 515 (7th Cir. 2009) (citing 735 ILCS 5/13–217); *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (same). Second, substantial federal judicial resources have not yet been committed to the state law claims. *See Davis*, 534 F.3d at 654 ("[T]he district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case."). And, third, it is not readily apparent how the state law claims will be resolved. Given all this, relinquishing jurisdiction over the state law claims is the appropriate course under § 1367(c)(3). *See Dietchweiler*, 827 F.3d at 631; *RWJ Mgmt. Co.*, 672 F.3d at 479-82.

## Conclusion

Plaintiffs' summary judgment motion is denied, Defendants' summary judgment motions are granted as to Plaintiffs' federal claims and denied without prejudice as to their state law claims, and the court relinquishes supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c)(3).

August 10, 2018

United States District Judge